949 A.2d 302

DONALD MCGOVERN, PLAINTIFF–APPELLANT, v. BOROUGH OF HARVEY CEDARS, BOARD OF COMMISSIONERS OF THE BOROUGH OF HARVEY CEDARS, AND JOHN GERKENS, IN HIS OFFICIAL CAPACITY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 19, 2008—Decided June 19, 2008.

Before Judges S.L. REISNER, GILROY and BAXTER.

*Arthur Stein* argued the cause for appellant (*Stein & Supsie,* attorneys; *Mr. Stein,* of counsel and on the brief; *Angela M. Velnich,* on the brief).

*Robert L. Cerefice* argued the cause for respondents (*Dowell & Wintrode,* attorneys; *Mr. Cerefice,* on the brief).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Plaintiff Donald McGovern appeals from a July 20, 2007 order of the Law Division dismissing his complaint in lieu of prerogative writs against defendants Borough of Harvey Cedars, the Borough's Board of Commissioners, and its Zoning Officer John Gerkens. We affirm, concluding that a municipal ordinance banning construction close to the water's edge on Long Beach Island

is constitutional and is not preempted by the Coastal Area Facilities Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –21.

## I

These are the most pertinent facts. Following a disastrous storm in 1962 which devastated Long Beach Island, the Borough of Harvey Cedars adopted an ordinance (ordinance 10–2.2 or the building line ordinance) precluding any construction east of a defined geographic line adjacent to the ocean-side perimeter of the town. Borough of Harvey Cedars Ordinances, Chapter 10–2.2, Waterfront Regulations.[1] *See Spiegle v. Beach Haven,* 46 *N.J.* 479, 218 *A.*2d 129 (1966)(*Spiegle I* ); *Spiegle v. Beach Haven,* 116 *N.J.Super.* 148, 154–55, 281 *A.*2d 377 (App.Div.1971)(*Spiegle II* ). The ordinance, which was adopted by virtually all of the other towns on Long Beach Island as well, was intended "to protect the health and safety of residents, as well as the protection of property."[2] By its terms, the ordinance was to be enforced by the Borough's building inspector. Waterfront Regulations § 10–6.2. In 1973, the Legislature adopted CAFRA, which was also aimed at protecting the State's shore area, including the dunes. *See Bubis v. Kassin,* 184 *N.J.* 612, 629–30, 878 *A.*2d 815 (2005).

---

[1] Ordinance 10–2.2 limits construction in a "beach dune area" to "protective works undertaken by the borough" as well as access, sand fences and bulkheads. "Beach dune area" is defined under ordinance 10–1.2 as

the district set off by this chapter to include the dunes, beaches, strand, backshore and foreshore, and the areas where, according to normal beach profile, the same would or should exist. The beach-dune area, as defined herein, has been established by . . . [the] Borough Engineers, and constitutes all that area lying eastwardly of the building line [subsequently defined as the line designated on a 1965 map prepared by the borough engineer,] and as designated on any future revision thereof. . . .

[2] At oral argument, both counsel agreed that the building line ordinance is not unique to Harvey Cedars but rather has been adopted by virtually every municipality on Long Beach Island. According to counsel's undisputed representations, the one exception is a town at the tip of the island, Barnegat Light, that purchased the property closest to the ocean for public use.

Decades later, in 2003, plaintiff sought to construct a ten-by-sixty foot lap pool between his oceanfront house and the ocean in Harvey Cedars, but he was unable to get permission due to the building line ordinance.[3]  In pursuit of his goal, plaintiff went to the Borough's zoning office to obtain the necessary municipal zoning permit.  As described in plaintiff's July 25, 2004 letter to the Board of Commissioners, the Zoning Office

> advised me that this project was problematic because the entire pool would be East of the building line, even though there is sufficient room for all town swimming pool requirements to be met.  They also informed me that I would need a CAFRA Approval from the State; so I decided to pursue this first.

Although he was already on notice that the pool project would violate the building line ordinance, plaintiff nonetheless applied for and, on May 24, 2004, obtained a CAFRA permit for the construction of the pool.[4]  Paragraph nine of the permit specified that it did not relieve plaintiff of the obligation to comply with local regulations.  Plaintiff returned to the Borough's zoning office with his CAFRA permit to apply for a municipal zoning permit for the pool.  He was directed to contact the Board of Commissioners, as the matter remained outside of the zoning office's jurisdiction.

Plaintiff attended the June 17, 2004 meeting of the Zoning Board of Adjustment and raised the issue of his obtaining a municipal zoning permit for the construction of the pool.  The Zoning Board Solicitor indicated that the Board lacked the authority to answer plaintiff's inquiry as dune protection was under the municipality's police powers.

On July 25, 2004, plaintiff wrote to the Board of Commissioners requesting approval to proceed with the pool project.  Consistent

---

[3] As evinced by the lawful presence of a house on plaintiff's land, the ordinance has not regulated plaintiff's property into inutility, as his counsel candidly conceded.

[4] According to zoning officer Gerkens' March 5, 2007 answers to interrogatories, plaintiff first showed him a plot plan with no building line delineated on it; thus he did not know at first that the plan violated the building line ordinance and, in that context, told plaintiff that he needed a CAFRA permit.

with what plaintiff had been told when he first approached the Zoning Board, the municipal attorney wrote back to plaintiff advising him that no construction was permitted beyond the "building line" and directing plaintiff's attention to ordinance 10–2.2. Counsel added "that there is no provision for a variance, deviation or waiver." Municipal counsel also advised plaintiff that the building inspector was responsible for enforcing the ordinance. Plaintiff responded that the proposed pool would not infringe upon the beach dune area protected by the ordinance. On August 11, 2005, plaintiff's counsel wrote to the Board of Commissioners raising the issue of preemption by CAFRA.

Plaintiff's counsel sent a letter dated November 21, 2005, to the zoning office asserting that the proposed pool complied with all zoning requirements and that the only open issue was the applicability of ordinance 10–2.2. In other words, plaintiff apparently sought a zoning permit in order to complete his preparations for a lawsuit challenging the ordinance, by establishing that the pool otherwise complied with local zoning. The zoning office responded that plaintiff would be required to complete an application for a zoning permit and pay the $75 application fee in order for the office to perform an evaluation. Thereafter, on March 8, 2006, plaintiff filed his application for a zoning permit and paid the fee.

On March 15, 2006, Zoning Officer Gerkens denied plaintiff's application for a zoning permit, because it would violate the building line ordinance as well as a setback portion of the zoning ordinance. Gerkens explained that the proposed construction was prohibited as it would occur "eastward of the 'building line' " and that "the pool equipment [is] not permitted within the yard setbacks." In a June 16, 2006 letter, Gerkens further explained that the permit was denied based upon "two areas of non-compliance with our [zoning] ordinances of Chapter 13."

Plaintiff corrected the Chapter 13 setback violations and again requested issuance of a zoning permit. On July 18, 2006, the municipal attorney sent plaintiff's counsel another letter on behalf of the governing body stating that the permit still could not be issued because the proposed pool was in violation of the building

line ordinance. In response to plaintiff's request for a formal grant or denial of his zoning permit application, the municipal attorney wrote to him once again on July 27, 2006, stating that although plaintiff met all zoning requirements, the project was not eligible for a zoning permit "because the swimming pool would be located east of the building line." By letter dated August 29, 2006, municipal counsel further indicated that the zoning board had no jurisdiction with respect to the ordinance and there was "no basis in the ... [o]rdinance for an appeal to the governing body."

In response, plaintiff filed an action in lieu of prerogative writs against the Borough and its officials. In denying plaintiff's request for relief, Judge Oles held that that CAFRA did not pre-empt ordinance 10–2.2. Noting that the ordinance was enacted in response to the devastating storm of 1962, the judge found that "there is no question" that it "protects and promotes health, safety and the general welfare of the community." He found that the ordinance did "not conflict with the purposes and the operations of [CAFRA]," but rather complemented them.

Judge Oles found that CAFRA was not "intended, expressly or impliedly, to be exclusive in the field." He observed that CAFRA protects all dunes located along New Jersey's coast, whereas ordinance 10–2.2 is concerned with the protection of life and property within the municipality's borders. He reasoned that the ordinance does not "encroach upon the need for uniformity with respect to dune protection, rather the exercise of the police powers recognizes the unique factual status of each municipality in relationship to the need for protection." The judge added that the ordinance was not an obstacle to the accomplishment of CAFRA's goals. Finally, he concluded that the ordinance did not constitute an unconstitutional taking of plaintiff's property without just compensation, since plaintiff was not "denied an economic viable use of the property."

## II

On this appeal, plaintiff contends that he was improperly denied a zoning permit, that the ordinance is unconstitutional because it

violates substantive due process, and that the ordinance is preempted by CAFRA.

■ Having reviewed the record, we conclude that plaintiff's arguments with respect to an alleged improper denial of a zoning permit are without merit. Plaintiff was told from the beginning that his proposed pool project violated the building line ordinance and that the Zoning Board did not have jurisdiction over enforcement of that ordinance. Since plaintiff for whatever reason repeatedly eschewed the correct procedure, namely to raise the ordinance issue with the local building inspector, his efforts to obtain approval despite the ordinance were properly rejected by the municipal governing body through its municipal counsel.[5]

We also find no merit in plaintiff's remaining arguments. Plaintiff contends that the ordinance is arbitrary and violates substantive due process. His central contentions are that the ordinance's sole purpose is to protect the dunes, but the ordinance does not rationally further that goal because the dune line shifts, while the ordinance mandates a fixed line beyond which building is prohibited.[6] Plaintiff's related contention is that the ordinance is preempted by CAFRA, which mandates a much more individualized inquiry into whether a particular proposed building will interfere with the dunes.

---

[5] While plaintiff did apply for a building permit for the pool, nothing in the record indicates that he alerted the building inspector to the issue of whether the pool's location would violate the building line ordinance. We find no error in the Zoning Board declining to issue a zoning permit for such a facially illegal project. By analogy, if plaintiff had sought a zoning permit to construct a five-story apartment building with no windows, or with no fire escape or other second means of egress, the Board could properly have declined to issue a permit until and unless plaintiff cleared his plans with the local building inspector.

[6] At oral argument, plaintiff's counsel agreed that if the purpose of the ordinance was to protect property by keeping buildings away from the water's edge, the ordinance would be rational.

We begin with plaintiff's due process argument. A municipal ordinance is "accorded a presumption of validity which can only be overcome by an affirmative showing that the ordinance is arbitrary or unreasonable." *Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.*, 80 *N.J.* 6, 20, 364 *A.*2d 1016 (1976), *cert. denied,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). "Enabling statutes delegating to municipalities the power to enact ordinances to promote the health, safety, and general welfare in the context of land use regulation should be given 'an expansive interpretation.' " *In the Matter of Egg Harbor Assocs.,* 94 *N.J.* 358, 366–67, 464 *A.*2d 1115 (1983).

The building line ordinance sprang from disasters unique to Long Beach Island. The devastation was described in *Spiegle II, supra,* which concerned a challenge to the ordinance as adopted in Beach Haven, where the 1962 storm temporarily cut the island in half:

> [M]ajor storms of hurricane intensity struck Beach Haven in 1944 and 1962.... Several homes nearby and to the west of the Spiegle properties were completely destroyed during the 1962 storm during which the ocean and bay waters merged at high tide over the southern portion of the borough.
>
> [116 *N.J.Super.* at 162, 281 *A.*2d 377.]

The history of the building line ordinance, which is common to virtually all towns on the island, reveals its purpose to protect property in addition to the dunes. Its genesis was described in detail in *Spiegle II:*

> By way of background information, the building line was established by the 1964 map. It generally paralleled the dune area which ran parallel to the shore line. William H. Taylor, a consulting civil engineer whose firm was the borough engineer until 1966, said the line was fixed in such a way that he would not consider it safe to build east of it. Homes located inland could be endangered by the destruction of beachfront houses if, for example, debris from the demolished home was swept inland by the ocean waters. Moreover, if the sewer lines connected to a home on the beach were to be ruptured by a storm, the municipal sewer system could become clogged with sand.
>
> [*Ibid.*]

The validity of this exact ordinance was challenged in *Spiegle I* and was upheld. In *Spiegle I,* the plaintiffs, owners of beach front land on which the ordinance prevented them from building, con-

ceded that the ordinance was rationally related to protecting public safety. 46 *N.J.* at 491, 218 *A.*2d 129. However, they contended that the ordinance constituted a taking of their property without just compensation. In rejecting this argument, the Court recognized the purpose of the ordinance to protect property:

> Plaintiffs failed to adduce proof of any economic use to which the property could be put. The Borough, on the other hand, adduced unrebutted proof that it would be unsafe to construct houses oceanward of the building line (apparently the only use to which lands similarly located in defendant municipality have been put), because of the possibility that they would be destroyed during a severe storm—a result which occurred during the storm of March 1962. Additionally, defendant submitted proof that there was great peril to life and health arising through the likely destruction of streets, sewer, water and gas mains, and electric power lines in the proscribed area in an ordinary storm. The gist of this testimony was that such regulation prescribed only such conduct as good husbandry would dictate that plaintiffs should themselves impose on the use of their own lands. Consequently, we find that plaintiffs did not sustain the burden of proving that the ordinance resulted in a taking of any beneficial economic use of their lands.
>
> [*Id.* at 492, 218 *A.*2d 129.]

The Court also concluded that the ordinance was not void for vagueness in describing the building line:

> The very nature of the subject matter of the definitions prevents more specific language than that employed. The shifting and unstable high water line and Dune Area are not susceptible of more particular description. The definitions are sufficiently clear and definite to furnish adequate information as to what was intended and to act as a restraint against arbitrary enforcement.
>
> [*Id.* at 493, 218 *A.*2d 129.]

Raising the question not directly answered in *Spiegle*, plaintiff urges that the ordinance violates substantive due process. Under both the United States Constitution and New Jersey Constitution, governmental regulation "is invalid on substantive due process grounds if it 'seeks to promote [a] state interest by impermissible means.'" *Caviglia v. Royal Tours of Am.*, 178 *N.J.* 460, 472, 842 *A.*2d 125 (2004). Governmental regulation

> generally does not run afoul of federal substantive due process protections if [it] "reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." If the statute is founded on some conceivable rational basis to promote a public purpose, it will survive constitutional scrutiny.
>
> [*Ibid.* (citations omitted).]

▮▮▮▮ To protect the public health, safety and general welfare, the "interests of one property owner must be subjected to some degree to the welfare of the general public." *Spiegle II, supra,* 116 *N.J.Super.* at 166, 281 *A.2d* 377.[7] However, the government regulation "must be reasonably designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property." *Berger v. State,* 71 *N.J.* 206, 223–24, 364 *A.2d* 993 (1976). The means selected must have "a real and substantial relationship to a permissible legislative purpose." *Caviglia, supra,* 178 *N.J.* at 473, 842 *A.2d* 125 (quoting *Taxpayer's Ass'n v. Weymouth Twp.,* 80 *N.J.* 6, 44, 364 *A.2d* 1016 (1976), *cert. denied,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977)). In light of the island's history of devastating storm damage, we cannot say that an ordinance prohibiting building close to the water's edge in order to protect the dunes and to prevent property damage from storms, is irrational, arbitrary or lacking "a real and substantial relationship" to the purpose of protecting the public health, safety and welfare. *Ibid.; N.J.S.A.* 40:48–2.

▮▮▮▮ We turn next to the issue of preemption. In determining whether a State statute preempts a municipal ordinance, we apply the test articulated in *Overlook Terrace Management v. Rent Control Board,* 71 *N.J.* 451, 366 *A.2d* 321 (1976):

> [p]reemption is a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the State. Preemption analysis calls for the answer initially to whether the field or subject matter in which the ordinance operates, including its effects, is the same as that in which the State has acted. If not, then preemption is clearly inapplicable. An affirmative answer calls for a further search for it is not enough that the Legislature has legislated upon the subject.
>
> Pertinent questions for consideration in determining applicability of preemption are:
>
> 1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?
> 2. Was the state law intended, expressly or impliedly, to be exclusive in the field?

---

[7] *Spiegle II* applied the holding of *Spiegle I* in addressing a further takings claim raised by the plaintiff.

3. Does the subject matter reflect a need for uniformity?

4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of a municipal regulation?

5. Does the ordinance stand as an obstacle to the accomplishment and execution of the full purpose and objectives of the Legislature?

[*Id.* at 461–62, 366 *A.*2d 321 (internal citations and quotations omitted).]

Ordinarily, pursuant to *N.J.S.A.* 40:48–2, a municipality may exercise its police powers to "legislate for the . . . protection of its residents and property owners," and such regulation will not be preempted absent a clear legislative intention.[8]  *S. Brunswick Twp. v. Covino,* 142 *N.J.Super.* 493, 498, 362 *A.*2d 51 (App.Div.1976).

In order for preemption to apply, the legislative intent to occupy the field must appear clearly. "The ultimate question is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act."

[*Ibid.* (citations omitted).]

Applying this precedent, we agree with the trial judge that CAFRA does not preempt the building line ordinance. CAFRA was intended to provide comprehensive protection for the State's "coastal area" without unduly interfering with the "overall economic position of the inhabitants of that area." *N.J.S.A.* 13:19–2. In other words, the statute was a compromise between the State's interest in preserving its coastal eco-system and the need to allow environmentally appropriate development for the economic benefit of those living in the coastal areas. *See Bubis, supra,* 184 *N.J.* at 629, 878 *A.*2d 815.

---

[8] *N.J.S.A.* 40:48–2 provides:

[a]ny municipality may make, amend, repeal and enforce . . . ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

CAFRA's history indicates that the Legislature did not intend to preempt all local regulation of dunes or coastal development. In fact, legislative comments to the 1993 CAFRA amendments specifically recognize that "[i]f a municipality has adopted a dune ordinance as stringent as State law and rules and regulations adopted pursuant thereto, as determined by the DEP [Department of Environmental Protection], then review pursuant to [CAFRA] would not be required for developments on dunes in that municipality." Assembly Environmental Committee Statement to Senate, No. 147—*L.* 1993, *c.* 190. *See also N.J.A.C.* 7:7–41 (DEP regulation providing that "[t]he provisions of CAFRA . . . are supplemental to other laws, including the Municipal Land Use Law"); *Anfuso v. Seeley,* 243 *N.J.Super.* 349, 365, 579 *A.*2d 817 (App.Div.1990).

Accordingly, our courts have recognized that CAFRA does not preempt municipal zoning or regulations with respect to dunes.

[A]s a general matter, CAFRA "regulations do not preempt local zoning authority." Rather, CAFRA "embod[ies] carefully considered policies for the use of coastal resources that local officials must take into account in zoning shoreline property within their communities."

[*Bubis v. Kassin, supra,* 184 *N.J.* at 630, 878 *A.*2d 815 (quoting *Lusardi v. Curtis Point Prop. Owners Ass'n,* 86 *N.J.* 217, 229, 430 *A.*2d 881 (1981)).]

*See also Toms River Affiliates v. N.J. Dep't of Environ. Prot.,* 140 *N.J.Super.* 135, 146, 355 *A.*2d 679 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1077 (1976).

In *Bubis,* for example, the Court found that a municipal ordinance regulating the height of fences in the town's beach area was not preempted by CAFRA.

The legislative purpose of CAFRA is to "preserve[ ] the most ecologically sensitive and fragile area from inappropriate development and provide[ ] adequate environmental safeguards for the construction of any developments in the coastal area" in a manner that is "in the best long-term, social, economic, aesthetic and recreational interests of all people of the State." *N.J.S.A.* 13:19–2. The ordinance operates on a smaller scale and simply sets forth a general objective for the beach zone in Loch Arbour: "to preserve the existing natural beach area and dunes which are present in the Village for their unique beauty and recreational assets." Thus, neither the purpose nor the specific provision of the ordinance at issue usurps the DEP's authority over dunes.

[*Id.* at 629–30, 878 *A.*2d 815.]

While *Bubis* did not address a building line ordinance, in citing to *Spiegle II, Bubis* recognized the purpose of the "local dune ordinance" to "prevent increased westward encroachment by the sea." *Bubis, supra,* 184 *N.J.* at 623, 878 *A.*2d 815.

Plaintiff's reliance on *Tumino v. Long Beach Twp.,* 319 *N.J.Super.* 514, 725 *A.*2d 1173 (App.Div.), *certif. denied,* 161 *N.J.* 332, 736 *A.*2d 525 (1999), is misplaced. There, we found a conflict between the Waterfront Development Act, *N.J.S.A.* 12:5–1 to –11, and a municipal regulation concerning docks. We concluded that the Legislature had manifested an intention to occupy the field of regulating dock construction. *Id.* at 525–28, 725 *A.*2d 1173. In that respect, *Tumino* is not on point, because our courts have already recognized that CAFRA does not preempt local regulation. *See Bubis, supra.* Moreover, in *Tumino,* the municipality sought to regulate the details of construction of local docks, in a manner that actually conflicted with State regulation of dock construction.

Significantly, we also noted that

the [municipal dock committee] was not concerned with whether a dock should be constructed in this zone but whether the dock would pose a hazard to navigation or impede access by neighbors to their waterfront facilities. The latter issues are within the exclusive control of the DEP.

[319 *N.J.Super.* at 527, 725 *A.*2d 1173.]

By contrast, in this case, the municipality is not seeking to regulate the construction of dunes in a manner inconsistent with CAFRA, but rather is prohibiting construction of buildings and other structures close to the water's edge. The ordinance thus protects both the dunes and the buildings. CAFRA does not prevent municipalities from providing more protection to the dunes than CAFRA would allow, and plaintiff has not pointed out any respect in which the municipal ordinance permits activity that CAFRA prohibits.

Like the fence ordinance in *Bubis,* the building line ordinance "operates on a smaller scale" than CAFRA, seeking to address a

local issue in light of Long Beach Island's particular vulnerability to storm damage. We find no preemption.

To the extent not specifically addressed here, plaintiff's remaining arguments are without sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

Affirmed.