959 A.2d 1215 (2008)
403 N.J. Super. 590
BOROUGH OF AVALON, Plaintiff-Appellant,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Defendant-Respondent.
No. A-3410-07T.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 2008.
Decided November 19, 2008.
*1217 Neil Yoskin, Princeton and Stephen D. Barse, Vineland, argued the cause for appellant *1218 (Sokol, Behot & Fiorenzo, Hackensack, and Gruccio, Pepper, DeSanto & Ruth, Vineland, attorneys; Mr. Yoskin and Mr. Barse, on the brief).
Dean Jablonski, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Melissa H. Raksa, Deputy Attorney General, of counsel; Lisa Daglis, Deputy Attorney General, and Mr. Jablonski, on the brief).
John C. Porto, County Counsel, argued the cause for amicus curiae County of Cape May (Mr. Porto, attorney; James B. Arsenault, Jr., Assistant County Counsel, on the brief). Gruccio, Pepper, DeSanto & Ruth, Vineland, for amicus curiae Borough of Stone Harbor (Michael J. Donohue, Stone Harbor, of counsel and on the brief).
Ansell, Zaro, Grimm & Aaron, Ocean, for amicus curiae American Littoral Society, Inc. (Gordon N. Litwin, of counsel; Andrew J. Provence, on the brief).
Before Judges SKILLMAN, GRAVES and GRALL.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
In 2007, the Department of Environmental Protection adopted rules, referred to as the Public Access Rules, which substantially expanded its authority over public access to beaches and other tidal waterways. 39 N.J.R. 5222(a).[1] One new rule requires any municipality located on a tidal waterway to allow public access to tidal waterways and their shores "at all times," unless the municipality obtains the DEP's permission to close the area during "late night hours" based on "unique circumstances" that threaten "public safety" or during other times for reasons such as "exigent circumstances." N.J.A.C. 7:7E-8.11(f). Other new rules require any municipality that seeks an appropriation from the "Shore Protection Fund" to enter into a "State Aid Agreement" with the DEP that, among other things, obligates the municipality to provide additional parking spaces and restroom facilities in proximity to the oceanfront as specified by the Public Access Rules and DEP directives. N.J.A.C. 7:7E-8.11(p)(7)(v); N.J.A.C. 7:7E-8A.2(c)(2)(i). The rules also require the municipality, if necessary, to acquire land, including by exercise of the power of eminent domain, in order to provide such additional parking spaces and restroom facilities. N.J.A.C. 7:7E-8.11(p)(7)(i)(l).
The Borough of Avalon, a municipality in Cape May County with approximately four miles of oceanfront that seeks to obtain an appropriation from the Shore Protection Fund, challenged the validity of these rules by a complaint in the Chancery Division, which was transferred to this court. We granted Avalon's motion to accelerate the appeal. The Borough of Stone Harbor and Cape May County have filed amici curiae briefs in support of Avalon's challenge to the rules, and the American Littoral Society has filed an amicus curiae brief in support of the rules.
Avalon alleged in its Chancery Division complaint, and the DEP does not deny, that its entire four miles of oceanfront is open to the public without any restrictions except for a requirement of payment of a *1219 reasonable beach fee. Avalon also alleged that it has sixty-two public streets that front on the beach, the majority of which provide open public beach access (the exception being thirteen streets that front on an environmentally sensitive "high dunes" area). Avalon further alleged that it currently has 5,700 on-street public parking spaces and 550 off-street public parking spaces, 370 of which are within one-quarter mile of the beach. There are no restrictions upon the use of any of these parking spaces. In addition, Avalon alleged that it maintains public restrooms at fifteen different locations. However, those restrooms are not located every half-mile along the oceanfront, as required by one of the challenged rules. Consequently, Avalon alleged that it would have to install portable restrooms at certain locations that do not currently have restrooms in order to comply with this requirement.
Avalon argues that the rules that require municipalities to provide unfettered public access to beaches and other tidal waterways at all times, except when the DEP grants the municipality permission for closure, and that require any municipality that seeks an appropriation from the Shore Protection Fund to agree to provide such additional parking spaces and restrooms as may be required under the DEP rules and directives, are not statutorily authorized and infringe upon the statutory powers of municipal government.[2] We agree that the challenged Public Access Rules are not statutorily authorized and therefore invalidate them.

I.
The Public Access Rule that requires municipalities to allow public access to tidal waterways and their shores at all times unless the municipality obtains the DEP's permission to close those areas states in pertinent part:
(d) Except as otherwise provided at (f) below, development on or adjacent to all tidal waterways and their shores shall provide on-site, permanent, unobstructed public access to the tidal waterway and its shores at all times, including both visual and physical access.
. . . .
(f) The permanent on-site public access. . . may be modified in the following circumstances. However, in no case shall such modification constitute permanent relinquishment of public trust rights of access to and use of tidal waterways and their shores.
1. Public access to tidal waterways and their shores shall be available at all times. However, the [DEP] may allow closure of an area otherwise available for public access during specified late night hours upon documentation of unique circumstances, other than the risk associated with tidal waterways, that threaten public safety and warrant such closure. In no case shall physical *1220 barriers be used to close public access....
2. The [DEP] may allow, require or impose temporary restrictions to public access, including closure of an area otherwise subject to public access, when it determines:
i. Exigent circumstances of public safety or security, or repair, maintenance, or construction relating to any public access infrastructure such as a walkway or boardwalk exist, ... to terminate immediately when such exigent circumstances cease to exist;
ii. Restrictions are necessary to protect endangered or threatened wildlife or plant species from disturbance or destruction; or
iii. Restrictions are necessary to protect other critical wildlife resources such as seasonal assemblages of wildlife in areas that provide critical feeding, roosting, resting or staging habitat....
[N.J.A.C. 7:7E-8.11 (emphasis added).]
The applicability of this rule is not dependent upon a municipality applying for an appropriation from the Shore Protection Fund. Thus, the rule applies to every municipality located on a tidal waterway.
The Legislature has delegated broad general police powers to municipalities to adopt such ordinances as they "may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants." N.J.S.A. 40:48-2. Under this statutory authority, "a municipality may exercise its police powers to `legislate for the ... protection of its residents and property owners,' and such regulation will not be preempted absent a clear legislative intention." McGovern v. Borough of Harvey Cedars, 401 N.J.Super. 136, 149, 949 A.2d 302 (App.Div.2008) (quoting S. Brunswick Twp. v. Covino, 142 N.J.Super. 493, 498, 362 A.2d 51 (App.Div.1976)).
In the exercise of its authority under N.J.S.A. 40:48-2, a municipality may close public parks and other public facilities during late night hours or other times when the use of such facilities may pose a threat to public safety and order. See Borough of Dumont v. Caruth, 123 N.J.Super. 331, 302 A.2d 566 (Mun.Ct. 1973). As observed by Judge (later Justice) Pashman, although "[a] municipality holds public property in trust for the public,... there is no requirement that such property must be made available for public use at all times." Id. at 335, 302 A.2d 566.
This general police power extends to municipally-owned beaches in the same manner as to all other municipally-owned property. In fact, the Legislature has enacted a statutory provision that expressly recognizes that seashore municipalities have "exclusive control" over municipally-owned beaches. This statute provides in pertinent part:
The governing body of any municipality bordering on the Atlantic Ocean, tidal water bays or rivers which owns ... lands bordering on the ocean, tidal water bays or rivers, ... for a place of resort for public health and recreation and for other public purposes shall have the exclusive control, government and care thereof ... and may, by ordinance, make and enforce rules and regulations for the government and policing of such lands ...; provided, that such power of control, government, care and policing shall not be construed in any manner to exclude or interfere with the operation of any State law or authority with respect to such lands, property and facilities.
[N.J.S.A. 40:61-22.20.]
We have previously recognized that this and other statutory provisions provide the *1221 requisite authority for a municipality "to close beaches and preclude use of property, even that falling within the Public Trust Doctrine, when the public safety and welfare is threatened." State v. Oliver, 320 N.J.Super. 405, 416, 727 A.2d 491 (App.Div.), certif. denied, 161 N.J. 332, 736 A.2d 525 (1999); see also State v. Vogt, 341 N.J.Super. 407, 423, 775 A.2d 551 (App. Div.2001) (noting that the public trust doctrine "does not prevent a municipality from imposing reasonable restrictions on that access and use").
In contrast to the express legislative delegation of broad general powers to municipalities to exercise exclusive control over municipally-owned beaches, the Legislature has not delegated any authority to the DEP to preempt or supervise a municipality's operation of its beaches. Moreover, we perceive no basis for implying such authority. It is the municipality, not the DEP, that owns and operates and therefore bears responsibility for the management of its beaches. The municipality must provide such police services as may be required to maintain public safety during the hours a beach is open to the public. In addition, the municipality must provide whatever emergency services may be required if a swimmer or other person using the beach suffers a personal injury. See Fluehr v. City of Cape May, 159 N.J. 532, 732 A.2d 1035 (1999).
We also note that the circumstances in municipalities bordering on the ocean and other tidal waterways vary greatly. It may be feasible in some municipalities to keep beaches or other waterfront properties open to the public at all times but in other municipalities it may be necessary sometimes to close those areas in the interests of public safety. A municipality that owns and operates property adjoining the ocean or other tidal waterway is in a better position than the DEP to determine whether the nature of its property and the public safety risks present within its community require the closing of that area at certain times.
It is of course possible that a municipality could exercise its statutory authority to close beaches in a manner that would violate the public trust doctrine. However, the possibility of such an abuse of municipal authority does not provide a basis for implying authority on the part of the DEP to require a municipality to keep its oceanfront property open to the public at all times unless it obtains the DEP's permission to close the area.
Moreover, the public trust doctrine cases the DEP relies upon in defending the validity of the rule requiring its permission to close municipally-owned oceanfront property recognize that the Legislature has delegated authority to municipalities to operate and regulate public beaches. In Van Ness v. Borough of Deal, 78 N.J. 174, 179, 393 A.2d 571 (1978), the Court stated: "Of course, the municipality, in the exercise of the police power and in the interest of public health and safety, would have the right to adopt reasonable regulations as to the use and enjoyment of the beach area." Accord Vogt, supra, 341 N.J.Super. at 423, 775 A.2d 551; Oliver, supra, 320 N.J.Super. at 416, 727 A.2d 491. Therefore, the public trust doctrine does not provide any basis for a DEP rule that preempts the statutory authority of municipalities to regulate municipally-owned beaches, including deciding when they shall be open to the public.
We also reject the DEP's argument that the Coastal Areas Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, provides authority for the DEP to require a municipally-owned beach to be open to the public at all times unless the municipality secures the DEP's permission to close the area. CAFRA's primary objective is "to protect the unique and fragile *1222 coastal zones of the State." In re Egg Harbor Assocs., 94 N.J. 358, 364, 464 A.2d 1115 (1983). To achieve this objective, the Legislature delegated broad authority to the DEP to regulate land uses in the coastal zone. Ibid. The principal means by which regulatory authority is exercised is by requiring a permit to be obtained from the DEP before certain types of development may be undertaken. N.J.S.A. 13:19-5. However, even though CAFRA delegates authority to the DEP to regulate certain land uses within the coastal zone, it does not preempt municipal regulation under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -99. See Bubis v. Kassin, 184 N.J. 612, 630, 878 A.2d 815 (2005); Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 229, 430 A.2d 881 (1981). Therefore, it is even clearer that, in conferring regulatory authority upon the DEP over land uses in the coastal zone, the Legislature did not authorize the DEP to preempt the basic municipal power to manage and control municipally-owned beaches, including deciding when those areas should be open to the public. See McGovern, supra, 401 N.J.Super. at 149-52, 949 A.2d 302.

II.
We turn next to the validity of the Public Access Rules that require any municipality that seeks an appropriation from the Shore Protection Fund to enter into a State Aid Agreement with the DEP under which the municipality may be required to provide additional parking spaces and public restroom facilities in proximity to the oceanfront. Regarding parking spaces, the applicable rule requires any municipality that participates in Shore Protection Program funding to agree that:
[i]mmediately upon completion of project construction, [it shall] provide parking sufficient to accommodate public demand to access the project and the beach capacity of all beaches within the municipality along that portion of the waterway on which the project occurs. The [DEP] may allow a reduction in the number of parking spaces required upon documentation that the municipality has exhausted all possibilities to provide the required number of parking spaces. Alternative methods of providing adequate parking that must be considered include land acquisition, restriping or reconfiguring parking, removing existing parking restrictions and providing remote/offsite parking with shuttle service[.]
[N.J.A.C. 7:7E-8.11(p)(7)(v) (emphasis added).]
Regarding restrooms, the applicable rule requires any municipality that participates in Shore Protection Program funding to adopt a "public access plan" that provides:
(1) There is at least one restroom facility every one-half mile within the municipality as measured generally parallel to the beach except in accordance with... below;
(2) A restroom facility shall be located within one-quarter mile of each municipal boundary. The one-quarter mile from the municipal boundary can be increased provided the one-quarter mile maximum distance from the landward edge of the beach or dune to the restroom is reduced by the amount the one-quarter mile is increased and the distance from the municipal boundary is no greater than three-eighths mile;
(3) Each restroom facility shall be located within one-quarter mile of the landward edge of the beach or dune; and
(4) The one-half mile interval between restrooms ... can be increased provided:
(A) The average interval between restrooms within the municipality is *1223 one-half mile, as measured generally parallel to the beach;
(B) The one-quarter mile maximum distance from the landward edge of the beach or dune to the restroom is reduced by the amount the distance between restrooms is increased; and
(C) In no case is the interval between restrooms greater than five-eighths mile, as measured generally parallel to the beach[.]
[N.J.A.C. 7:7E-8A.2(c)(2)(i).]
A municipality that receives Shore Protection Funds for an emergency shore protection or beach nourishment project must comply with these provisions within 180 days of completing the emergency project. N.J.A.C. 7:7E-8.11(p)(9). Moreover, if the DEP determines that a municipality's actions conflict with the public trust doctrine or any of the Public Access Rules, it may demand corrective action within thirty days, and if such corrective action is not taken, the DEP may:
i. Withhold Shore Protection Program funding;
ii. Terminate the State Aid Agreement;
iii. Demand immediate repayment to the Shore Protection Fund ...; and/or
iv. Pursue any other specific remedies in the State Aid Agreement.
[N.J.A.C. 7:7E-8.11(p)(10).]
The appropriation of money from the Shore Protection Fund is governed by N.J.S.A. 13:19-16.1 and -16.2. N.J.S.A. 13:19-16.1 provides in relevant part:
a. There is created in the Department of the Treasury a special non-lapsing fund to be known as the "Shore Protection Fund." The monies in the fund are dedicated and shall only be used to carry out the purposes enumerated in subsection b. of this section....
b. Monies deposited in the "Shore Protection Fund" shall be used, in accordance with the priority list approved by the Legislature pursuant to [N.J.S.A. 13:19-16.2] for shore protection projects associated with the protection, stabilization, restoration or maintenance of the shore, including monitoring studies and land acquisition, consistent with the current New Jersey Shore Protection Master Plan ... and may include the nonfederal share of any State-federal project. The requirements of [N.J.S.A. 13:19-16.2] notwithstanding, the Commissioner of [the DEP] may, pursuant to appropriations made by law, allocate monies deposited in the fund for shore protection projects of an emergency nature, in the event of storm, stress of weather or similar act of God.
N.J.S.A. 13:19-16.2 provides in relevant part:
a. The Commissioner of [the DEP] shall develop a priority system for ranking shore protection projects and establish appropriate criteria therefor.... [F]or each fiscal year ... the commissioner shall use the priority system to establish a shore protection project priority list for projects designated to receive funding pursuant to an appropriation made from the Shore Protection Fund.... The list shall include a description of each project and its purpose, impact, estimated cost, and estimated construction schedule, and an explanation of the manner in which priorities were established. A description of the priority system and the project priority list for the ensuing fiscal year shall be submitted to the Legislature on or before January 31 of each year.... The [legislative leaders] ... shall cause the project priority list to be introduced in each House in the form of legislative bills authorizing the expenditure of monies appropriated pursuant to [N.J.S.A. 13:19-16.1] for projects on the list, and shall refer these bills to [specified legislative *1224 committees] for their respective consideration.
b. Within 60 days of the referral thereof, the [legislative committees] shall, either individually or jointly, consider the legislation containing the project priority list, and shall report the legislation, together with any modifications, out of committee for consideration by each House of the Legislature. On or before June 1 of each year, the Legislature shall approve the legislation containing the project priority list.... The legislation approved by the Legislature shall authorize the expenditure of monies appropriated to the [DEP] from the Shore Protection Fund for the specific projects, including the estimated amounts therefor, on the list.
c. No monies appropriated from the Shore Protection Fund to the [DEP] shall be expended for any shore protection project unless the estimated expenditure is authorized pursuant to legislation approved in accordance with the provisions of [N.J.S.A. 13:19-16.2(b)] or unless the shore protection project is of an emergency nature pursuant to [N.J.S.A. 13:19-16.1(b)].
These statutory provisions confer only limited authority upon the DEP. Except for shore protection projects of an emergency nature, see N.J.S.A. 13:19-16.1(b), the DEP Commissioner's authority is limited to "develop[ing] a priority system for ranking shore protection projects and establish[ing] appropriate criteria therefor." N.J.S.A. 13:19-16.2(a). The Commissioner must use this priority system "to establish a shore protection project priority list for projects designated to receive funding ... from the Shore Protection Fund." Ibid. However, the DEP's priority list is simply a recommendation to the Legislature, which retains the ultimate authority to determine which non-emergency shore protection projects should be funded.
The DEP places substantial emphasis upon the fact that N.J.S.A. 13:19-16.1(b) requires money deposited in the Shore Protection Fund to be used consistent with the current New Jersey Shore Protection Master Plan prepared by the DEP in 1981. Division of Coastal Resources, Department of Environmental Protection, New Jersey Shore Protection Master Plan (1981). This plan contains "a general discussion" about public access to beaches. Id. at II-36 to -45 (citing some of the then-current cases addressing issues of beach ownership and the public trust doctrine that were unresolved at the time).
There is no doubt N.J.S.A. 13:19-16.1(b) requires the DEP to follow its Master Plan in establishing a shore protection priority list, but the Legislature still retains the ultimate authority to determine the projects that will receive appropriations from the Shore Protection Fund, regardless of the DEP's Master Plan and priority list. Most significantly, there is nothing in the Master Plan that purports to give the DEP authority to direct a municipality, as a condition of receiving shore protection funds, to provide additional parking spaces and restroom facilities in proximity to the beach including, if necessary, by acquisition of private property for this purpose. Therefore, we reject the DEP's suggestion that the Legislature has implicitly approved of such requirements by directing that the DEP priority list conform with the Shore Protection Master Plan.
We also reject the DEP's argument that the public trust doctrine provides the required authorization for the adoption of these rules. The essential thrust of the cases dealing with application of the public trust doctrine to municipally-owned beaches has been that a municipality must provide non-residents with the same access to its beaches as its own residents. Thus, in *1225 Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 294 A.2d 47 (1972), the Court invalidated a municipal ordinance that imposed higher fees upon non-residents than upon residents for use of municipally-owned beaches; in Van Ness v. Borough of Deal, supra, 78 N.J. 174, 393 A.2d 571, the Court held that a municipality may not set aside part of its municipally-owned beach for the exclusive use of its own residents; and in Hyland v. Borough of Allenhurst, 78 N.J. 190, 393 A.2d 579 (1978), the Court held that a municipality that maintains toilet facilities adjacent to a municipally-owned beach must allow access to those facilities to all persons who use the beach. In Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 326-34, 471 A.2d 355, cert. denied, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), the Court extended these principles to a beach that was owned and operated by a "quasi-public" association with close connections to the municipality rather than by the municipality itself.
However, the Court has never held that the public trust doctrine requires a municipality that owns and operates a beach to provide a specified number of parking spaces and restrooms in proximity to the beach or that the DEP has the authority to impose such requirements upon a municipality. Therefore, we conclude that the public trust doctrine does not provide authorization for the DEP rules imposing these requirements.
The DEP also relies upon CAFRA as authorization for adoption of these rules. CAFRA requires a construction permit for "[any] development located in the coastal area on any beach or dune[,]" N.J.S.A. 13:19-5(a), and it defines "development" to include "the grading, excavation or filling on beaches or dunes," N.J.S.A. 13:19-3. Thus, CAFRA seems to require a construction permit for any shore protection project. See N.J.A.C. 7:7-2.1.[3]
However, CAFRA does not include any provision authorizing the DEP to condition the issuance of such a permit upon a municipality agreeing to provide additional parking spaces or restrooms in order to facilitate public access to the beach. Despite the absence of such a provision in CAFRA, the DEP relies upon the part of Raleigh Avenue Beach Ass'n v. Atlantis Beach Club, 185 N.J. 40, 60-62, 879 A.2d 112 (2005), which holds that CAFRA authorizes the DEP to review the reasonableness of beach fees charged to members of the public entitled to beach access under the public trust doctrine. The Court found such authority in the DEP's general power under CAFRA "to promote the health, safety and welfare of the public." Id. at 61, 879 A.2d 112 (quoting Egg Harbor, supra, 94 N.J. at 372, 464 A.2d 1115).
We conclude that Raleigh Avenue cannot be reasonably read to interpret CAFRA as extending authority to the DEP to condition state aid for shore protection upon a municipal agency agreeing to provide additional public parking and restrooms including, if necessary, acquiring private property for this purpose. The Court's decision in Raleigh Avenue was rooted in the core principle of the public trust doctrine that the public is entitled to access to the ocean and upland beach (including certain private beaches under the circumstances discussed in Matthews and Raleigh Avenue) upon payment of a reasonable, nondiscriminatory fee to cover costs of maintenance. See Raleigh Avenue, supra, 185 N.J. at 59-62, 879 A.2d 112. Consequently, the Court concluded *1226 that the DEP has implied authority under CAFRA to administer and enforce this component of the public trust doctrine. Id. at 62, 879 A.2d 112.
However, it does not follow that the DEP also has implied authority to impose whatever additional obligations the DEP deems appropriate to facilitate public access to the beach. An administrative agency only has the powers that have been "expressly granted" by the Legislature and such "incidental powers [as] are reasonably necessary or appropriate to effectuate" those expressly granted powers. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978) (quoting In re Regulation F-22, Office of Milk Indus., 32 N.J. 258, 261, 160 A.2d 627 (1960)). "Where there exists reasonable doubt as to whether such power is vested in the administrative body, the power is denied." In re Closing of Jamesburg High Sch., 83 N.J. 540, 549, 416 A.2d 896 (1980).
In determining whether a power that has not been expressly granted should be implied, our courts have distinguished between rules or other agency actions that involve an assertion of authority that is simply "incidental" to its expressly granted powers and ones that implicate "an important policy question." See Jamesburg, supra, 83 N.J. at 550-51, 416 A.2d 896; Burlington County Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 598-99, 267 A.2d 533 (1970); Chopper Express, Inc. v. Dep't of Ins., 293 N.J.Super. 536, 542, 681 A.2d 1226 (App.Div.1996); see also In re N.J. Individual Health Coverage Program's Readoption of N.J.A.C. 11:20-1, 179 N.J. 570, 579-80, 847 A.2d 552 (2004). As the Court explained in Cooper, the determination of "a policy question of that significance lies in the legislative domain and should be resolved there." 56 N.J. at 598, 267 A.2d 533.
Although the DEP's assertion of authority to review the reasonableness of beach fees can be viewed as "incidental" to the powers the Legislature expressly granted to the DEP under CAFRA, because a municipality's obligation to charge only reasonable, non-discriminatory beach fees is a well-established component of the public trust doctrine, the same cannot be said of the DEP's assertion of authority to prescribe the number of parking spaces and restrooms in proximity to the beach that must be provided by a municipality that seeks Shore Protection Funds. The cases interpreting and applying the public trust doctrine do not require municipalities adjoining the oceanfront and other tidal waterways to provide parking spaces and restrooms for persons who use the beach. Whether to impose such an obligation upon those municipalities, and if so, how to determine the magnitude of the obligation and the manner in which it should be satisfied, implicates "important policy question[s]", Cooper, supra, 56 N.J. at 598, 267 A.2d 533, that in our judgment are within the exclusive province of the Legislature. The Legislature could of course delegate authority for making these decisions to the DEP. However, CAFRA does not contain such a delegation of authority.
Although our decision rests on the DEP's lack of statutory authority to adopt rules requiring a municipality to provide additional parking and restrooms as a condition of receiving an appropriation from the Shore Protection Fund, we also note that the parking rule is so vague that, even if it were statutorily authorized, it would be subject to invalidation on the ground that it "`significant[ly]' fails to `provide ... regulatory standards that would inform the public and guide the agency in discharging its authorized function.'" N.J. Soc. for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 955 *1227 A.2d 886 (2008) (quoting Lower Main St. Assocs. v. N.J. Housing & Mortgage Fin. Agency, 114 N.J. 226, 235, 553 A.2d 798 (1989)). The Public Access Rule dealing with parking requirements states that a municipality must provide "parking sufficient to accommodate public demand to access the project and the beach capacity of all beaches within the municipality along that portion of the waterway on which the project occurs." N.J.A.C. 7:7E-8.11(p)(7)(v). The DEP acknowledges that there is no formula to determine how this parking requirement would be determined. Instead, the DEP indicates that this determination would be made on a case by case basis. This would create a substantial risk of arbitrary decision-making. Furthermore, if a municipality was required to apply to the DEP for Shore Protection Funds for an emergency project as provided under N.J.S.A. 13:19-16.1(b), the municipality would have no way of knowing what requirements regarding additional parking spaces the DEP might thereafter impose, because the Public Access Rules provide a 180-day period after completion of a Shore Protection project within which the DEP may establish, and the municipality must comply with, those requirements. N.J.A.C. 7:7E-8.11(p)(9).
Accordingly, the DEP Rules that require a municipality to allow public access to tidal waterways and their shores "at all times" unless it obtains the DEP's permission to close the area and that require a municipality that seeks an appropriation from the Shore Protection Fund to enter into a State Aid Agreement that obligates the municipality to provide such additional parking spaces and restroom facilities in proximity to the oceanfront as the DEP may mandate are declared invalid.
NOTES
[1] On September 10, 2008, the Governor signed into law the Public Access and Marina Safety Task Force Act, which imposes a moratorium on the effectiveness of the Public Access Rules as applied to marinas. L. 2008, c. 82 (codified at N.J.S.A. 13:19-38 to -44). The moratorium expires on December 31, 2010. N.J.S.A. 13:19-40. Because this moratorium applies only to the marina areas of tidal waterways, it has no direct effect upon this appeal, which challenges the validity of certain Public Access Rules as applied to the entire oceanfront and other tidal waterways. See N.J.A.C. 7:7E-3.50.
[2] Avalon's statement of facts also refers to a rule that requires a municipality that seeks an appropriation of Shore Protection Funds to provide public accessways to the oceanfront at least every quarter mile. See N.J.A.C. 7:7E-8.11(p)(7)(iii). However, Avalon has not presented any argument regarding the validity of this rule. Moreover, given the extensive public access Avalon provides to its oceanfront, it is unclear whether this rule would require Avalon to provide any additional access to its beach. Absent full briefing of the validity of the public accessways rule or any indication that it directly impacts upon Avalon, we do not consider the validity of this rule to be before us. We also note that the amicus curiae brief of Stone Harbor criticizes several of the Public Access Rules that Avalon has not challenged. However, "[a]n amicus curiae may not interject new issues, but must accept the issues as framed and presented by the parties." Fed. Pac. Elec. Co. v. N.J. Dep't of Envtl. Prot., 334 N.J.Super. 323, 345, 759 A.2d 851 (App.Div.2000).
[3] We note that CAFRA authorizes DEP waivers for "grading or excavation of a dune by a governmental agency." N.J.S.A. 13:19-5.3.